+

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

MICHAEL LOONSFOOT, Individually )
and for Others Similarly Situated, )
                                   )
        Plaintiff,                 )
                                   )        Case No. 3:23-CV-03171-DWD
vs.                                )
                                   )
STAKE CENTER LOCATING, LLC,        )
                                   )
        Defendant.                 )

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

Plaintiff Michael Loonsfoot ("Loonsfoot") filed the instant case, a purported class action, seeking to recover unpaid wages and other damages from his former employer, Stake Center Locating, LLC ("SCL"). Plaintiff claims SCL failed to pay employees for compensable "off-the-clock" work (work employees were allegedly required to complete during their meal breaks, as well as before clocking in and after clocking out). In addition, Plaintiff claims SCL paid its employees an allowance for "auto pay," but failed to include that amount in each employee's regular rate of pay for purposes of calculating the appropriate amount of overtime pay. Plaintiff claims that SCL's off-the-clock and auto pay policies violate the Illinois Minimum Wage Law ("IMWL") by depriving employees of overtime wages.[1]

---

[1] On July 29, 2024, the Court granted, in part, SCL's Motion for Partial Judgment on the Pleadings, dismissing Plaintiff's IWPCA claim (Count 2) without prejudice.

Now before the Court is the Motion to Certify Class filed by Loonsfoot on behalf of himself and others similarly situated. (Docs. 49, 50). SCL has filed a response (Doc. 55), and Plaintiff has filed a reply (Doc. 56).  SCL and Loonsfoot have both filed supplemental authority. (Doc. 58-2) (*Monroe v. Stake Center Locating, LLC*, No. 2:23-cv-00692-EWH-DEM (E.D. Va.) (denying class certification as to similar off-the-clock claims brought against SCL in Virginia and granting class certification as to a similar auto allowance claim) and (Doc. 60-1) (*Kinsey v. Stake Center Locating*, LLC, No. 161185/2023 (Supreme Court of the State of N.Y., County of N.Y.)) (granting class certification as to similar off-the-clock claims brought against SCL in New York).

## II. PROPOSED CLASS DEFINITION

Loonsfoot filed this action on September 21, 2023. (Doc. 1). Initially, Loonsfoot purported to represent a class that consisted of: "All hourly employees who worked for SCL in Illinois at any time during the past 3 years[.]" (Doc. 1 ¶ 34). However, Plaintiff's Motion for Class Certification has revised the class definition, seeking instead to certify the following class:

> All hourly Utility Locators who worked for SCL in Illinois who were subject to SCL's pre-and postshift work policy, meal break policy, auto allowance policy, and/or per diem pay scheme at any time during the 3 years prior to the filing of this Complaint until final resolution of this action (Class Members)

(Doc. 50, pg. 6).

## III. PRELIMINARY MATTER – PER DIEM PAY SCHEME

Although Loonsfoot purports to seek certification based on the "per diem pay scheme," the Complaint does not include any allegations pertaining to a "per diem pay

2

scheme." Additionally, other than alleging that SCL violated the IMWL by "failing to include 'automobile pay' and per diem pay in regular rate for overtime rate calculation" (Doc. 50, pg. 12), Loonsfoot's Motion for Class Certification does not address this claim in anyway. Given the Complaint's silence on the "per diem pay scheme," and the Motion's cursory allegation regarding the same, the Court cannot assess whether a common question exists or predominates across the class. Accordingly, Loonsfoot has not satisfied Rule 23's certification requirements with respect to the "per diem pay scheme" claim. For these reasons, the Motion to Certify the "per diem pay scheme" claim will be denied without further discussion.

### IV.    BACKGROUND AND ALLEGATIONS

#### A.  Stake Center Locating

SCL is a limited liability company that provides utility locating services to utility owners and operators across the country. (Doc. 1 ¶¶ 39-40). To fulfill these services, SCL employs individuals in positions such as Gas Techs, Lead Gas Techs, Utility Locators, Field Managers, and Trainers. Utility Locators ("Locators") generally work alone in the field with limited direct oversight. (Doc. 54-2). Each Locator is assigned to a specific territory and reports to an area manager. (Doc. 54-1 ¶ 13). SCL utilizes a ticketing system through which clients request underground utility markings near construction sites. (Doc. 54-1 ¶ 5). SCL assigns each ticket to a Locator, who travels to the job site and performs the marking. (Doc. 54-1 ¶ 6).

### B. Michael Loonsfoot

Loonsfoot worked for SCL in Illinois from approximately December 2021 until June 2023. (Doc. 1 ¶¶ 2, 22–23, 41, 44–45). During his employment with SCL, he held four positions: (1) non-exempt hourly Utility Locator (Dec. 20, 2021 – Mar. 1, 2022), (2) exempt salaried Area Manager (Mar. 1 – Jun. 15, 2022), (3) non-exempt hourly Trainer (Jun. 15, 2022 – Jan. 2023), and (4) non-exempt Lead Utility Locator (Jan. or Mar. 16, 2023[2] – Jun. 23, 2023). (Docs. 1 ¶¶ 23–24; 50-3 ¶ 2; 50-4, pg. 45).

### C. Official Compensation Policies

SCL has written policies regarding clocking in and out, mandatory meal breaks, and overtime pay. (Doc. 54-1 ¶¶ 4-5; Ex. A). These policies state that Locators must be clocked in and paid for all time worked. (Doc. 54-1, Ex. A). In March 2023, SCL updated its Illinois meal break policy in response to changes in Illinois law. (Doc. 50-28; Doc. 54-6, pgs. 13-15, 28). Under the revised policy, Locators are prohibited from working through meal breaks for any reason. (*Id*.). They must begin the first 30-minute meal period no later than the start of their fifth consecutive hour of work. (*Id*). If they work more than twelve hours, a second meal period must begin by the tenth hour. (*Id*.).

### D. Automobile Allowance Policy

SCL provides Locators with a company vehicle to perform their job duties and to commute to and from work. (Doc. 50-27). Company vehicles are not used for any other

---

[2] The Complaint and portions of the deposition indicate that Loonsfoot transitioned from a trainer to a lead locator in January 2023. (Docs. 1 ¶¶ 23, 24; 50-3 ¶2; 50-4, pg. 45). However, other portions of his deposition and SCL business records indicate that the "effective date" of being moved from a trainer to a lead locator was March 16, 2023. (Doc. 150-4, pg. 160, 176).

personal purpose. (*Id*). The IRS considers the value of an employer-provided vehicle used for commuting a taxable fringe benefit that must be included in an employee's income (commonly known as the "Commuting Rule"). (Doc. 50-29, pg. 2; Doc. 21 ¶ 24). The amount that is required to be reported as income is $1.50 each way ($3.00 per day). (*Id*.). Consistent with the Commuting Rule, SCL deducts the value of the use of the vehicle from its Locators' pay. (*Id*.). That deduction is reflected on Locators' weekly earnings statements as a deduction entitled "Vehicle Fringe." (*Id*.). In a typical five-day workweek, the Vehicle Fringe deduction is $15.00. (*Id*.). Locators also receive a weekly payment from SCL in the amount of the Vehicle Fringe deduction to reimburse them for the earnings deduction.  That Automobile Reimbursement is reflected on the Utility Locators' weekly earnings statements as "Vehicle Allowance." (*Id*.). SCL does not include the Vehicle Allowance when calculating an employee's regular rate of pay for purposes of determining the proper overtime rate. (*Id*.).

### E.  Loonsfoot's Allegations

Loonsfoot alleges that, contrary SCL's official policies, Locators were not paid fully for all hours worked in Illinois. Loonsfoot claims that two unwritten policies mandated that Locators work off-the-clock, resulting in them not being paid fully. Loonsfoot refers to the first policy as the "pre- and post-shift" policy and to the second policy as the "meal break" policy (collectively, referred to as the "off-the-clock" policy or policies). According to Loonsfoot, given SCL's productivity and operational requirements, Locators were required to perform compensable work (1) before and/or after their shifts off-the-clock

(under the unwritten pre- and post-shift policy) and (2) during their unpaid meal breaks (under the unwritten meal break policy).

Loonsfoot's final claim pertains to SCL's Automobile Allowance Policy (or "Auto Policy") (described above). As noted above, SCL does not include the Vehicle Allowance in Locators' regular rate of pay. Loonsfoot claims that this practice resulted in Locators not being paid at the lawful overtime rate.

## V.    EVIDENTIARY RECORD

The parties have submitted depositions, declarations, reports, email communications, and other records in support of their arguments for and against class certification. The evidence is summarized below.[3]

### A. Deposition of Michael Loonsfoot

#### 1. Meal Break Policy

Loonsfoot testified that Locators were required to take unpaid 30-minute meal breaks at the five-hour and ten-hour marks. (Doc. 50-4, pgs. 16, 20, 44). If a Locator failed to clock out, a supervisor would edit their time entry to reflect a break had been taken. (*Id*.). Loonsfoot estimated that during 90% of his required meal breaks, he performed work-related tasks such as answering emergency calls, speaking with contractors or coworkers, or working on tickets. (Doc. 50-4, pgs. 21–22). He estimates that 50% of the

---

[3] Although the Court has reviewed the entire record, it only summarizes material that is necessary to or affects its analysis. The Court also summarizes material to the extent that it is necessary to resolve any objections thereto. Finally, given the parties' apparent agreement as to the Auto Policy claim (see discussion *infra*), the Court does not summarize evidence relevant to that claim.

time he didn't clock out, yet a supervisor still altered his time to show a break. (Doc. 50-4, pg. 25).

Loonsfoot claims that, if a ticket was completed during an unpaid meal break, a supervisor would edit the time stamp to conceal that it was handled off-the-clock. He knows that supervisor Sarah Hall and "Nicholas" (a supervisor in Kansas) have edited the time stamps on tickets completed off-the-clock. (Doc. 50-4, pgs. 22–23). Sarah Hall told Loonsfoot she makes these alterations so no one will get in trouble. (Doc. 50-4, pg. 24).

Sarah Hall told Loonsfoot he would be disciplined if he failed to answer emergency calls, help coworkers, or complete tickets during his lunch. (Doc. 50-4, pg. 32). Although Sarah Hall and Sam Romando (also a supervisor) instructed him to clock out for meal breaks, Loonsfoot testified he was still expected to perform work during those times. Loonsfoot's belief as to this expectation was based on his experience of being told to take calls during breaks. (Doc. 50-4, pgs. 47–48).

On March 17, 2023, SCL sent a company-wide email announcing a new meal break policy. (Doc. 50-4, pg. 89; Doc. 50-28). The revised policy was prompted by changes in Illinois law. (Doc. 50-4, pgs. 20, 21, 88, 112). The policy mandated a 30-minute, unpaid, uninterrupted meal break after working for five consecutive hours, and a second 30-minute break after working for ten consecutive hours on days employees worked for twelve or more hours. (Doc. 50-4, pg. 89). Prior to March 17, 2023, taking a 30-minute break was not mandatory. (Doc. 50-4, pgs. 26–27, 45, 88, 112). When Loonsfoot began his employment as a Locator, he was not required to clock out and take a lunch, and

managers did not "go behind his back" and add a 30-minute meal period that was not taken. (Doc. 50-4, pgs. 26, 45). At that time, Loonsfoot typically worked his entire shift without taking a meal break. (Doc. 50-4, pgs. 26, 45). However, if he did take a meal break, it was a true break, and he did not work. (Doc. 50-4, pgs. 26-27).[4]

Initially, Loonsfoot said his first issue with being forced to clock out, regardless of whether he took a true meal break, occurred as a lead locator toward the end of his employment. (Doc. 50-4, pg. 27).[5] Later, he said this began two months after becoming a trainer, and that the directive came from Sam Romando. (Doc. 50-4, pgs. 28–31, 53).[6]

---

[4] Specifically, Loonsfoot stated as follows:
A We weren't required to clock out for lunch if we were working previous to UtiliSphere. So, no.
Q So you weren't required to take a lunch –
A Correct.
 Q -- when you first started?
A Correct.
Q Did you take lunches when you first started?
A Oh, God no. It was so busy. No.
Q So if we look at your time records from when you started, there won't be lunches?
A You -- you might find one or two, but that's about it.
Q And if we did find one or two lunches, those would've been actual lunches that you –
A Correct.
Q -- clocked out and you took and you didn't do work?
A Yes. That's correct.
(Doc. 50-4, pgs. 26-27).
[5] Loonsfoot transitioned to being a lead locator in January or March 2023. Loonsfoot's position as a Trainer began in June 2022.
[6] Q When you went back to being a locator, that was the first time that you started having these 15 issues about clocking out whether you were taking a lunch or not?
A No. That's incorrect.
Q Okay. When did that start?
A When I went back to being hourly as a trainer.
 Q Okay. So at the time you started being a trainer, who was your supervisor?
A This -- for the first week it was Boyd Goodman.
Q And after Mr. Goodman, who was your trainer?
A Mike Hall.
Q And after Mr. Hall, who was your supervisor?
A Salvatore. Craig Panter. Mike Hall.
Brandon Leonard. Sam Romando.
Yep. That's what –
Q And when you went back to being a trainer, when did you first -- when were you first told you need to clock out for lunch and keep working?
A I don't remember an exact time date. Can I give a rough estimate?

In June 2023, Sarah Hall emailed Locators instructing them not to handle personal matters while working and to do so only during their lunch breaks or with paid time off. (Doc. 50-4, pgs. 92–93). Loonsfoot felt the email was disingenuous because he and others still took work calls during those unpaid breaks. (Doc. 50-4, pg. 94). Regarding a different email stating employees must notify Sarah Hall when leaving the field to take lunch, Loonsfoot called it a "half-truth," stating it only applied "to certain people at certain times." (Doc. 50-4, pg. 99). He testified that if a locator had numerous high-priority tickets or emergencies, Sarah Hall was unlikely to allow the locator to take an uninterrupted meal break. (Doc. 50-4, pg. 100). He acknowledged, however, that on slower days, Sarah Hall allowed some employees to leave the field for an uninterrupted meal break. (Doc. 50-4, pgs. 100–101).

Loonsfoot was questioned about records reflecting that he took long lunch breaks on several occasions (e.g., 1–1.5 hours on Sept. 9 and Sept. 15, 2022), which he attributed to personal matters but stated he still handled work calls if they came in. (Doc. 50-4, pgs. 105–114). He later claimed that meal breaks were "technically always an issue," because if GPS data showed he left the field (e.g., drove home), he was required to clock out, even if handling calls during that time. (Doc. 50-4, pg. 113).

As a Trainer, Loonsfoot said he typically worked through his lunch, but his trainees were relieved from work and took uninterrupted meal breaks. (Doc. 50-4, pgs. 53–54, 75, 104). As a Manager, Loonsfoot supervised 15 Locators. Loonsfoot indicated he

---

Q Sure.
A It'd probably be roughly two months after I started becoming a trainer.
(Doc. 50-4, pgs. 28-29).

instructed his subordinates to take 30-minute unpaid meal breaks and denied ever telling them to work during breaks. (Doc. 50-4, pg. 121). He says no one in management ever directed him to require off-the-clock work during meal breaks. (*Id*.). He does not specifically remember if he was ever aware of any of his subordinates working during a meal break, and he hopes that they did not work during their meal breaks. (Doc. 50-4, pg. 121).

### 2. Pre and Post Shift Work Policy

Loonsfoot was required to work overtime as a Trainer, averaging 25 overtime hours per week. (Doc. 50-4, pg. 30).

As a Locator and Lead Locator, Loonsfoot said he performed about 30 minutes of work before clocking in to review daily tickets. (Doc. 50-4, pgs. 34–35). Supervisors allegedly told him he could not clock in while planning his route. (Doc. 50-4, pg. 35). He also answered work-related calls before clocking in and after clocking out. (Doc. 50-4, pgs. 36–38). Locators were told to clock out after completing the last ticket and could not clock back in unless responding to an emergency even if they were performing other work-related tasks. (Doc. 50-4, pgs. 37–38).

Loonsfoot testified that overtime restrictions varied week-to-week depending on workload and each Locator's "tickets per hour" (TPH) rating. Those with a TPH of 2.5 or higher were typically exempt from the overtime cap. Loonsfoot fell into this category and rarely faced overtime restrictions. (Doc. 50-4, pgs. 40–41).

At times, he worked 70–90 hours per week and was paid for that time. Nonetheless, he also worked 2–4 hours per day off the clock, including weeks where he logged 70–90 paid hours. (Doc. 50-4, pgs. 61, 66–67).

As a Manager, Loonsfoot supervised approximately 15 Locators. (Doc. 50-4, pg. 121). During that time, he saw no clear indication that his Locators were working off-the-clock, apart from occasional 2–3-minute discrepancies. (Doc. 50-4, pg. 122). He never instructed Locators he supervised to work off-the-clock or plan their routes before clocking in. (*Id*.). However, he acknowledged hearing that Locators would routinely plan routes off-the-clock, calling it an "unspoken thing." (Doc. 50-4, pgs. 123–124).

Supervisors told him Locators needed to have their day planned when they finished their shifts. (Doc. 50-4, pg. 124). Boyd Goodman (a manager that supervised Loonsfoot for approximately one week when he was a Trainer) told Loonsfoot Locators should not plan their next day's route while at their last job site, but rather between job sites while still on the clock. (Doc. 50-4, pg. 125).

When he began as a Locator, area managers "Doug" and "Greg" allegedly told him SCL would not pay for time spent responding to work calls outside of clocked hours. (Doc. 50-4, pg. 149).

Loonsfoot reviewed a December 17, 2022 email where he listed tasks he performed while on the clock, including phone calls and planning. (Doc. 150-4, pg. 172). Sal Caponigro, a regional or senior regional manager, approved the time and Loonsfoot was compensated for that work. (Doc. 150-4 pgs. 172-72). He attributed the inconsistency (i.e.

11

being paid for taking phone calls and prepping for the next day) to "different circumstances throughout the year." (Doc. 50-4, pgs. 172–174).

### B. Declarations in Support of Motion for Class Certification[7]

On November 14, 2024, after completing his deposition, Loonsfoot executed a declaration. (Doc. 50-3). In his declaration, Loonsfoot states that he was employed as a Locator in Illinois from approximately December 2021 through June 2023. (Doc. 50-3, ¶ 2). He further attests that, during his employment with SCL, he experienced the following:

> 5.  All SCL Utility Locators are also subject to the same policies and procedures. This is [sic].

> 6.  For example, SCL's written policy says all Utility Locators must clock out for meal periods and not perform any work during the meal period.

> 7.  But SCL's managers uniformly told me and other Utility Locators to work through meal periods if that's what it took to complete all our tickets.

> 8.  Even if I didn't clock out for a "meal period" (because I didn't take one), my time worked was later adjusted down so I wasn't paid for the "meal period" even though I was working.

> 9.  Due to SCL's demanding productivity requirements, I often couldn't take a meal break. In fact, myself and the other Utility Locators rarely received an actual uninterrupted 30 minute "meal break."

---

[7] Loonsfoot attaches three additional declarations to his Reply in Support of Motion for Class Certification. (Doc. 55; Doc. 55-36; Doc. 55-37; and Doc. 55-38). These declarations are virtually identical to the previously filed declarations. All three declarations were executed in August 2024, prior to Loonsfoot filing his Motion for Class Certification. New arguments and evidence may not be raised for the first time in a reply brief. *See Gold v. Wolpert,* 876 F.2d 1327, 1331 n. 6 (7th Cir. 1989). Loonsfoot does not provide any reason for why these declarations were not included in his Motion for Class Certification. The Court, therefore, declines to consider these declarations. However, for reasons discussed below, even if the Court were to consider the additional declarations, which contain the same generic, conclusory allegations as the earlier filed declarations, they would be entitled to little weight and would not alter the Court's analysis.

10.     On top of that, I often worked more than 40 hours a week. Some of this time under and over 40 hours was entirely off the clock or my recorded time was adjusted down.

11.     For example, I was often required to clear tickets after I clocked out without pay.

12.     We were told to schedule tickets, call customers, and map routes, either before or after we clocked out after our last ticket of the day.

13.     There was a strong expectation from SCL to perform this off the clock work because of the heavy workload. We were told to perform this work off the clock. And when we recorded overtime worked for these types of activities it was usually adjusted so I wasn't paid for that time.

14.     To my knowledge, all SCL Utility Locators were paid on an hourly basis.

15.     To my knowledge, all SCL Utility Locators regularly worked more than 40 hours in a workweek.

16.     To my knowledge, all SCL Utility Locators didn't get paid for all hours worked for the reasons described above.

17.     Not only were SCL Utility Locators required to work through their 30 minute "meal breaks," they were also required to perform work after their shifts were over and they clocked out.

18.     That was due to SCL's strict operational and productivity requirements.

19.     I was sometimes required to be "on-call" 24 hours a day for 7 days a week. So were the other Utility Locators.

20.     I wasn't paid for being "on call" unless I had to respond to an unscheduled ticket.

21.     These policies were uniformly applied to all SCL's Utility Locators and resulted in all SCL Utility Locators performing compensable work "off the clock" without pay.

(Doc. 50-3).

Loonsfoot also submitted the declarations of 16 current and former SCL Locators.

(Docs. 50-5 through 50-20). These declarations were executed after the completion of

Loonsfoot's deposition. Aside from employment dates and personal identifiers, the

declarations provided by Loonsfoot include identical statements (including the typo contained in paragraph 5). The only difference the Court can discern is the time-period of employment during which the declarants claim they were subject to off-the-clock and meal break policies. (*See* Doc. 50-5, Craig McDowell Declaration (employed and subject to the alleged policies from October 2022 to present); Doc. 50-6, Ricky Nelson, Jr. Declaration (employed and subjected to the alleged policies from January of 2022-January of 2023);[8] Doc. 50-7, Jalen Bolden Deposition (employed and subject to the alleged policies from February 2022 to August 2022);[9] Doc. 50-8, Heather Broughton Declaration (employed and subject to the alleged policies from February 2022 through August 2022); Doc. 50-9, Henry Bangsberg Declaration (employed and subject to the alleged policies from June of 2023 through November 2023); Doc. 50-10, Jason Dean Declaration (employed and subject to the alleged policies from June 2022 through February 2023); Doc. 5-11, Justin Rollins Declaration (employed and subject to the alleged policies from June 2021 to June 2023);[10] Doc. 5-12, Kidd Morrison Declaration (employed and subject to the alleged policies from February 2022 to February 2023); Doc. 50-13, Michael Keller Declaration (employed and subject to the alleged policies from August 2022 to present); Doc. 50-14, Nicole Rehder Declaration (employed and subject to the alleged policies from December 2021 to June 2022); Doc. 50-15, Steven Hardy Declaration (employed and

---

[8] SCL's employment records, however, reflect that Ricky Nelson was employed as a locator from December 20, 2021 until January 24, 2023. (Doc. 54-1, ¶ 17).

[9] SCL's employment records reflect that Jalen Bolden was employed as a locator from February 7, 2022 until August 6, 2022, and was rehired as a locator on June 3, 2024. (Doc. 54-1 ¶ 19).

[10] SCL's employment records, however, reflect that Justin Rollins was employed as a locator from March 2022 until May 2023. (Doc. 54-1 ¶ 14).

subject to the alleged policies from February 2021 to February 2023);[11] Doc. 50-16, Zachary Wright Declaration (employed and subject to the alleged policies from April 2023 to August 2023); Doc. 50-17, Luis Morales Declaration (employed and subject to the alleged policies from November 2021 to present); Doc. 50-18, Shawn Burton Declaration (employed and subject to the alleged policies from November of 2022 to December 2023); Doc. 50-19, Gregory Beckstrom Declaration (employed and subject to the alleged policies from December 2021 to April 2022);[12] Doc. 50-20, Joshua Litteken Declaration (employed and subject to the alleged policies from December 2022 to June 2024)).[13]

Many of the declarants allege they were subject to the disputed meal-break policy prior to August 2022, which contradicts testimony from Loonsfoot indicating that the disputed meal break policy began in March 2023 or approximately two months after he became a trainer (August 2022). Additionally, many of the declarants allege managers uniformly instructed them to work off-the-clock (during meal breaks and before/after clocking in and out) at a time when Loonsfoot was a manager and trainer. Such statements contradict Loonsfoot's testimony that, as a manager and trainer, he never instructed Locators to work during meal breaks or to work off-the-clock, that his superiors never instructed him to do so, and that he was unaware of any Locators reporting to him working off the clock.

---

[11]SCL's employment records, however, reflect that Steven Hardy was employed as a locator from February 7, 2022 until August 8, 2022. (Doc. 54-1, ¶ 15).

[12] SCL's employment records, however, reflect that Gregory Beckstrom was employed as a locator from November 2022 until April 2023. (Doc. 54-1, ¶ 16). Prior to that, he was employed as an area manager from December 13, 2021 until November 20, 2022. (*Id.*).

[13] SCL's employment records, however, reflect that Josh Litteken was employed as a locator from December 28, 2021 until June 2024. (Doc. 54-1 ¶ 18).

The declarations do not include any allegations regarding the declarant's specific experiences as Locators working for SCL.

### C. Sarah Hall Email

On April 14, 2023, Loonsfoot's area manager, Sarah Hall, emailed her Locators stating as follows: "You only need to answer [emergencies] between 7AM and 5PM. Before or after that will go to on call. I would turn your phone on silent at night, the emergencies fall in the polys first before dispatch pulls them for the on-call tech. (Doc. 54-8, pgs. 6-7).

### D. Declarations of Philip Paulat and Kaaleb Moorefield

In support of its response, SCL attaches declarations from Philip Paulat and Kaaleb Moorefield. Both are current SCL employees who are presently or have previously worked as Locators. (Doc. 54-3; 54-4). In their declarations, Moorefield and Paulat attest to the following: Locators plan their routes for the next day's tickets before clocking out for the day. (Doc. 54-3 ¶ 7; Doc. 54-4 ¶ 17). Although work is to be completed between the first and last tickets, SCL occasionally permits work before and after tickets if needed. (Doc. 54-3 ¶ 14; Doc. 54-4 ¶ 15). SCL's policy, both in writing and in practice, is to pay Locators for all hours worked. (Doc. 54-3 ¶¶ 12-36; Doc. 54-4 ¶¶ 13-35). Both Moorefield and Paulat state they were never instructed to work off-the-clock, including during meal breaks and they are not aware of any instances where a manager added a 30-minute meal break or otherwise shorted their time. (*Id*.).

### E.  Declaration of David Kennedy

In support of its response, SCL attaches a declaration from David Kennedy. (Doc. 154-5). Kennedy provides his declaration based on his personal knowledge gathered during his employment as the Chief Information Officer for SCL and a review of SCL's records. (Doc. 154-5 ¶ 1). In his declaration, Kennedy attests to the following: From September 2020 until November 2022, SCL used a timekeeping system known as TCOR. When TCOR was in use, Locators manually keyed in their time worked at the end of the day. (Doc. 154-5 ¶ 5). In November 2022, SCL began using a timekeeping system known as Irth Utilisphere ("Irth"). (Doc. 154-5 ¶ 6). Irth allows Locators to clock in and clock out in real-time. (Doc. 154-5 ¶ 7). Kennedy reviewed a report generated by Irth detailing instances where Loonsfoot's time records were edited and who was responsible for any such edits. (Doc. 154-5 ¶ 8). That report indicates that, from August 2022 to June 2023, Loonsfoot's supervisors edited his time on three days (four edits in total). (Doc. 154-5 ¶ 17; 154-5 Exhibit A). One occasion involved changing Loonsfoot's time from "regular time" to "on-call time," but his overall time was not changed. The next edit occurred on May 28, 2023. (*Id.*). On that day, Sarah Hall changed Loonsfoot's clock out time from 7:16 PM to 6:30 PM, she then added two hours of time, from 8:30 PM to 10:30 PM, to Loonsfoot's timesheet. (*Id.*). Finally, the day Loonsfoot was terminated, Sarah Hall edited his time to reflect actual hours worked. (*Id.*). None of the edits involved adding a 30-minute unpaid meal break. (Doc. 154-5 ¶ 18; Doc. 154-5 Exhibit A).

Kennedy's declaration also includes an IRTH report for declarants who worked for SCL on or after March 2023. (Doc. 154-5 Exhibits B-J). These reports do not include any instances of supervisors adding a 30-minute unpaid meal period for any of those declarants. (*Id.*).

### F. Sam Romando Declaration and Deposition

In support of its response, SCL attaches a declaration from Sam Romando, an SCL operations manager. Romando attests to SCL's policies and procedures both in practice and in writing. (Doc. 154-2). Additionally, SCL attaches portions of Romando's deposition, detailing the same. (Doc. 154-7).

Plaintiff also relies on Romando's deposition. Plaintiff points to Romando's testimony to support his claim that all policies, written and unwritten, were applied "universally to all Utility Locators." (Doc. 50, pg. 11). In the portions of Romando's deposition cited by Plaintiff, Romando testified as follows: Pursuant to SCL's policy, all locators should clock-out after their last ticket, and they should plan their start ticket for the following day before clocking out. (Doc. 50-26, pg. 21). All locators are allowed to clock-in when they arrive at the job site for their first ticket. (Doc. 50-26, pg. 21). All locators are required to clock out for a mandatory 30-minute lunch break. (Doc. 50-26, pgs. 22, 71). Locator's job duties are similar or almost the same. (Doc. 50-26, pg. 27). SCL treats all employees equally and applies the same policies and procedures to all of its locators. (Doc. 50-26, pgs. 23, 27).

### G. Similar Litigation Against SCL in Other Jurisdictions

Similar class action lawsuits have been brought against SCL in other jurisdictions. *See e.g., Kinsey v. Stake Center Locating, LLC*, No. 161185/2023 (Supreme Court of the State of N.Y., County of N.Y.) (class certification granted as to utility workers alleging wage and hour violations under New York law on July 9, 2025);[14] *Wolfe v. Stake Center Locating, LLC*, No. 230402591 (Court of Common Pleas, Philadelphia County) (class certification granted May 21, 2024) (Doc. 50-1); *Monroe v. Stake Center Locating, LLC*, No. 2:23-cv-00692-EWH-DEM (E.D. Va.) (class certification with respect to vehicle claim granted, class certification with respect to unpaid work during meal periods and before/after clocking in and out denied March 27, 2025) (Doc. 58-2).

In support of his claims, Loonsfoot attaches portions of the depositions taken in *Kinsey* and *Wolfe*, which are discussed below.

### 1. Scott McCullough – *Wolfe* deposition

In the *Wolfe* deposition, McCullough testified that, as the director of Human Resources, he needs to ensure that all employees are treated equally and are subject to the same standards. (Doc. 50-25, pgs. 9-10). He also confirmed that utility locators in Pennsylvania are subject to the same procedures and requirements, including for example being required to complete their tickets in a timely manner and being subject to the same clocking in and out procedures. (Doc. 50-25, pgs. 16-17). He further testified that

---

[14] In finding that commonality was met under New York law, the court noted that the named plaintiff and former and current SCL employees attested to being subject to the same policies (no additional detail is provided regarding the content of any declarations), that McCullough testified all employees are subject to the same standards, and that whether SCL's practices violated New York law was a question common to the class. (Doc. 60-1).

utility locators in Pennsylvania are subject to the same meal break policy, requiring them to clock out for a 30-minute unpaid meal break. (Doc. 50-25, pg. 17).

### 2. Scott McCullough – *Kinsey* deposition

In the *Kinsey* deposition, McCullough testified that, per the employee handbook, when a locator is clocked out, he is "not to perform work", and that it would be a violation of SCL's policy if an employee is working off-the-clock. (Doc. 50-24, pg. 9). McCullough testified that all locators are given the same handbook which provides details regarding compensable time and when locators should first log-in for the day. (Doc. 50-24, pg. 11). He testified that, pursuant to the handbook, which is applicable to all Locators, employees "will be compensated for all authorized work performed on behalf of the company." (Doc. 50-24, pg. 13). He testified that, when a locator is required to clock-out varies depending on state law, what region of the country a locator works in, and the parameters of a particular contract. (Doc. 50-24, pg. 15, 29). One difference that depends on where an employee works is whether the employee is paid from ticket to ticket or from door to door. (Doc. 50-24, pg. 29).  Although there are differences based on these variances, the same handbook applies to and is given to all Locators. (Doc. 50-24, pg. 22). He testified that, pursuant to SCL's uniform policy, SCL pays locators for every hour worked and people are paid time and a half for approved overtime. (Doc. 50-24, pgs. 31-32). He testified that every locator in New York is required to take a 30-minute meal break. (Doc. 50-24, pg. 22). Even though there are some differences depending on what state a locator works in, the same handbook applies to all locators. (Doc. 50-24, pg. 22).

### 3. David Doyle – *Kinsey* deposition

David Doyle is the Director of Operations for the East Coast. In the excerpts provided, Doyle testified to the following: A regional manager was terminated for, among other things, failing to properly communicate to his managers what is and is not compensable time. (Doc. 50-31, pgs. 11-13). Compensable time is anything work related, including opening a laptop and prepping for the day. (Doc. 50-31, pg. 13). Payment policies vary by location and are based on state law. (Doc. 50-31, pg. 14). In New York, for example, Locators are paid according to the door-to-door policy, meaning Locators are paid from the time they leave their house until they return home. (Doc. 50-31, pgs. 13-14). In Virginia, Locators are paid according to the ticket-to-ticket policy, meaning they are paid beginning with their first ticket and ending with their last ticket. (Doc. 50-31, pg. 15). However, if a Locator opens his laptop, reviews maps, or is making plans for site visits, he is paid for that work. (Doc. 50, pgs. 15-16).

### 4. Jaquan Kinsey – deposition (Plaintiff in *Kinsey* case)

In the portion of the deposition attached to the motion, Kinsey testified that he was not being compensated for work he performed before and/or after clocking out, and during his required 30-minute meal periods. (Doc. 50-22). He told supervisor "Anzo" he was working during his meal periods. (doc. 50-22, pgs. 12-13). Anzo asked him why he was doing that and told him he could "eat on the go." (Doc. 50-22, pg. 13). Area Manager Scott Koontz told Kinsey, "whether you take a lunch break or not, the 30 minutes will come out of your pay." (Doc. 50-22, pgs. 13-14). Regarding working during unpaid meal breaks, Mr. Koontz responded, "This is the job." (Doc. 50-22, pg. 14). Kinsey testified he

often handled work related tasks after clocking out. (Doc. 50-22, pgs. 14-19). He often cleared tickets after clocking out because if he did not finish all of his tickets, he would be written-up and because Koontz said, "We need help to get the job done." (Doc. 50-22, pgs. 19-20). Kinsey interpreted this to mean he should be clearing tickets after clocking out. (Doc. 50-22, pg. 20). When Kinsey worked for "Richard" his paycheck was shorted twice, but as far as he knows his other pay checks were not shorted. (Doc. 50-22, pgs. 22-23). When "Gerardo" became his manager, his pay checks were shorted every other week. (Doc. 50-22, pg. 23). And when "Scott" was his manager, his paychecks were shorted even more than when Gerado was his manager. (Doc. 50-22, pg. 28).

### 5. Austin Wolfe – deposition (Plaintiff in *Wolfe* case)

In the provided excerpts, Wolfe testified to the following: If he complained to human resources about his hours being cut, he would have been fired. (Doc. 50-23, pg. 12). He knew this because he was warned that Pennsylvania is an at-will employment state, and that he should be careful about things he says. (Doc. 50-23, pg. 12). He is aware of one other employee who met with human resources and was fired approximately two weeks later. (Doc. 50-23, pg. 13). However, he does not know what this employee discussed with human resources or why he was terminated, but he was an exemplary Locator. (Doc. 50-23, pg. 13). Shawn McGarry instructed "all of [them]" to work off-the-clock during weekly conference calls. (Doc. 50-23, pg. 14).

### H. Scott McCullough – Declaration and Employee Handbook

SCL attached a declaration from McCullough attesting to SCL's handbook, timekeeping, and payroll policies. (Doc. 54-1). It also includes a copy of SCL's employee

22

handbook, and notes discrepancies in the dates of employment and job titles listed in certain Locator depositions submitted by Loonsfoot. (*Id*).

### I. Scott McCullough – March 17, 2023 Email

On March 17, 2023, Scott McCullough transmitted an email to all Illinois employees. (Doc. 50-28). The email detailed SCL's 30-minute mandatory meal period policy. (*Id*). The email indicates that on any day where an employee performs over 7.5 consecutive hours of work, he or she must take an unpaid 30-minute non-working meal break. (*Id*.). The meal-break must begin no later than the start of the fifth consecutive hour worked, and a second 30-minute meal period must be taken on days where an employee performs over twelve hours of work. (*Id*.). Second meal periods must start no later than the tenth consecutive hour worked. (*Id*.).

### VI.    REQUEST TO DISREGARD

In their reply brief, Loonsfoot asks the Court to disregard the declarations of Philip Paulat (Doc. 54-3), Kaaleb Moorefield (Doc. 54-4), and David Kennedy (Doc. 54-5). (Doc. 55, pg. 3).  Plaintiff contends that these witnesses were not included in SCL's initial disclosures and therefore cannot be used to support their motion in opposition to class certification.  (*Id*.). Additionally, Loonsfoot argues that these "happy camper" declarations are particularly concerning given SCL's "deceptive new 'bonus' program." (Doc. 55, pgs. 4-5; Doc. 50-4, pgs. 14-15). According to Loonsfoot, SCL has implemented a bonus program wherein Locators are eligible for a $1,000.00 bonus if they work 1,000 hours after July 1, 2024, but only if they sign SCL's arbitration agreement and class action

waiver. (Doc. 55; Doc. 50-4, pgs. 14-15; Doc. 55-39). Loonsfoot further notes that, in the *Monroe* case, the Court concluded that SCL's communications regarding such a program were abusive and ordered issuance of an appropriate corrective notice. (Doc. 55-39; Doc. 55-40).

As an initial matter, the Court notes that Plaintiff did not attach SCL's Rule 26(a) disclosures. Thus, the request fails to provide any evidence supporting the claim that the initial disclosures were inadequate. Plaintiff further complicates the issue by embedding the request to disregard in his reply brief rather than in a separately filed motion.[15] In the Southern District of Illinois sur-reply briefs are strictly prohibited, *See* SDIL 7.1(a)(4), making it difficult for SCL to respond to the allegations. Although not strictly prohibited, the Court, in the exercise of its discretion, could deny the embedded request to disregard these declarations. Such a ruling, however, is unnecessary. For the reasons set forth below, the Court finds that, even without considering the disputed declarations, Loonsfoot has not met his burden for class certification under Rule 23. Accordingly, the request to "disregard" the declarations of Paulat, Moorefield, and Kennedy, which the Court does not rely on in reaching its decision, is terminated as **MOOT**.

### VII.   LEGAL STANDARD

Under Rule 23(a), members of a class may sue as representatives of the class only if: (1) the class is so numerous that the joinder of all members would be impracticable; (2)

---

[15] Courts generally expect motions to be raised in a standalone filing to allow all parties a fair opportunity to respond, as outlined in Rule 12(f) (motions to strike) or Rule 37(c)(1) (failure to disclose under Rule 26(a)). A reply brief is intended to address arguments made in opposition, not to introduce new requests for relief.

there are questions of law or fact that are common to the class; (3) the claims of the representatives are typical of the claims of the class; and (4) the representatives fairly and adequately protect the interests of the class. FED. R. CIV. P. 23(a). If these requirements are satisfied, then a class action may be maintained if, as is relevant here, the Court finds the common questions of law or fact predominate over any questions affecting only individual members and a class action would be superior to the other available methods of fairly and efficiently adjudicating the controversy. FED. R. CIV. P. 23(b)(3).

When considering a motion for class certification, the Court must go beyond the pleadings and, if necessary, receive evidence on any disputed material issues. *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1025 (7th Cir. 2018) (citing *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 377 (7th Cir. 2015); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675–76 (7th Cir. 2001)). While "the merits are not on the table," Plaintiffs have the burden of proving by a preponderance of the evidence that Rule 23 is satisfied. *Id.* (citing *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 810 (7th Cir. 2013); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)).

The Court has broad discretion to decide whether class certification is proper. *Jacks v. DirectSat USA, LLC*, 118 F.4th 888, 894 (7th Cir. 2024) (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 629 (7th Cir. 1997)). "Rule 23 does not set forth a mere pleading standard." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011). "On issues affecting class certification...a court may not simply assume the truth of the matters as asserted by the plaintiff." *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 811 (7th Cir.2012). Certification is proper only if "the trial court

is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Dukes*, 131 S.Ct. at 2551. The Seventh Circuit has directed district courts to exercise "caution in class certification generally." *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 746 (7th Cir.2008).

## VIII. ANALYSIS

### A. Off-The-Clock Work Claims

#### 1. Numerosity

As to the numerosity requirement contained in Rule 23(a)(1), the "class representative must show 'that it is extremely difficult or inconvenient to join all the members of the class.' " *Anderson v. Weinert Enter., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021) (quoting 7A C. Wright & A. Miller, Federal Practice & Procedure § 1762 (3d ed. 2011)). It is not enough to allege a class action would make litigation easier, as the proper focus is on the practicality of joinder rather than the mere number of class members. *Id.* For this reason, the Court evaluates the nature of the action, the size of the individual claims, and the location of the members of the class. *Id.* (quoting Wright & Miller, § 1762).

Here, the putative class, which has already been identified by SCL, includes at least 459 Locators. (Doc. 50-21). SCL does not contest that the proposed class is sufficiently numerous or that joinder of all members would be impracticable. (Doc. 54). Considering the nature of this class action, the size of the individual claims, and the location of the members of the class in Illinois, the Court finds Plaintiffs have satisfied the numerosity requirement.

26

### 2. Commonality

" 'Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury' at the hands of the same defendant." *McCaster v. Darden Restaurants, Inc.*, 845 F.3d 794, 800 (7th Cir. 2017) (citing *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50, (2011). "But it's not enough for the plaintiffs to show that class members 'have all suffered a violation of the same provision of law.'" *Id.* (citing *Wal-Mart*, 564 U.S. 350). Rather, the class claims must depend upon a common contention that is capable of class-wide resolution. *Howard v. Cook Cnty Sheriff's Office*, 989 F.3d 587, 598 (7th Cir. 2021). In other words, "[w]hat matters to class certification … is not the raising of common 'questions' – even in droves – but, rather the capacity of a class wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. 350. Afterall, "[a]ny competently drafted class complaint literally raises common 'questions.'" *Id.* at 349. "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* at 350.

Additionally, in wage and hour cases alleging violations of compensation requirements, plaintiffs must demonstrate that such violations were the result of a uniform, top-down directive as opposed to the practices of individual supervisors. *See Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 375 (7th Cir. 2015) ("Cases in which low-level managers use their given discretion to make individual decisions … do not satisfy commonality because the evidence varies from plaintiff to plaintiff."); *Vang v. Kohler Co.*, 488 F. App'x 146, 147 (7th Cir. 2012) ("Unless plaintiffs can establish a firm-wide policy" as opposed to "supervisor-level practices", … "Rule 23(a)(2) prevents class

certification."); *Aguilera v. Waukesha Mem'l Hosp., Inc.*, No. 13-C-1245, 2015 WL 3791469 (E.D. Wis. June 18, 2015) (finding no commonality amongst class members in a class action involving interruptions during unpaid meal breaks where evidence of an organization-wide policy was lacking and where alleged interruptions involved a "wide spectrum of activities, some of which might be work and some of which might not.").

Loonsfoot contends the requirement of commonality is met because SCL subjected members of the putative class to standardized conduct as evidenced by several common issues, including whether SCL's alleged unofficial pre-and post-shift work policy and meal break policy violate state law and resulted in SCL failing to pay its Locators for all hours worked. (Doc. 50, pgs. 13-17). Loonsfoot contends that it "should be easy" for the Court to find commonality because he "provided his own declaration and the declarations of 16 other Locators[,]" demonstrating that they were all subject to standardized conduct. (*Id*.).

Loonsfoot also alleges there are numerous common questions of fact, including (1) whether class members worked off the clock without pay because SCL told them to; (2) whether class members worked off the clock without pay because SCL instructed them to clock out for a "lunch break" but to keep working; and (3) whether class members worked 40 or more hours during one or more weeks. (Doc. 50, pg. 16). Loonsfoot contends these facts are necessarily common because testimony from SCL managers establishes that SCL treats everyone equally and subjects all employees to the same policies.

Loonsfoot also claims commonality is met because there are other proposed class actions in other jurisdictions against SCL bringing the same claims. He further asserts that individualized issues go only to damages and do not defeat commonality. (*Id*.).

As an initial matter, Loonsfoot's Motion for Class Certification relies heavily on his declaration and the declarations of 16 putative class members attesting to SCL's alleged unspoken off-the-clock work policies. For several reasons, the Court finds that this testimonial evidence is entitled to little weight. First, many of the statements lack foundation. For example, declarations include statements attesting to the experiences of other Utility Locators at SCL (e.g., "other Utility Locators rarely received an actual uninterrupted 30 minute 'meal break.'" (Doc. 50-3 ¶ 9); "all SCL Utility Locators regularly worked more than 40 hours in a workweek" (Doc. 50-3 ¶ 15); SCL's policies resulted in resulted in "all SCL Utility Locators performing compensable work 'off the clock'" without pay (Doc. 50-3 ¶ 21)). But the declarations do not explain how each declarant has personal knowledge of the amount of overtime other Locators worked, that other Locators "rarely" received an uninterrupted meal period, or that all Locators performed compensable work off-the-clock.

Second, apart from identifying information and employment dates, the declarations are identical (including a typographical error contained in ¶ 5) and replete with conclusory statements. Although not fatal, this certainly makes the declarations less persuasive. *See* e.g., *Walker v. Health & Hosp. Corp. of Marion Cnty.*, No. 115CV01978JMSTAB, 2016 WL 7179370, at *14 (S.D. Ind. Dec. 9, 2016) ("conclusory statements" in "identical declarations are not enough to establish a common policy or

practice…"); *Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 63 (E.D.N.Y. 2012) (conclusory or cookie-cutter statements in declarations go to credibility of the declarants and, by extension, the weight of the evidence).

Third, the identical declarations do not allege facts specific to the experiences of the declarant. *See* e.g., *Chatman v. Otani*, No. CV 21-00268 JAO-KJM, 2021 WL 2941990 (D. Haw. July 13, 2021) (giving more weight to declarations provided by plaintiffs noting their specificity and detailed accounts compared to defendants' "boiler plate" declarations).

Fourth, the sample size, 3.7% of the proposed class, is rather small and Loonsfoot has not provided any information as to how these particular declarants were chosen or explained why they are representative of the other 442 proposed class members.[16] Such a sampling, particularly without evidence that the declarants are "representative" does not provide a sufficient basis for concluding that Loonsfoot's claims are common to the entire proposed class. *See Wal-Mart*, 564 U.S. at 358 (in a class of around 334 individuals, "40 specific accounts[17] of racial discrimination" that were "spread throughout" the company provided substantial statistical evidence of a company-wide policy; but a smaller sampling of "about 1 for every 12,500 class members" did "not demonstrate that the entire company" operated under a discriminatory policy); *Espenscheid v. DirectSat*

---

[16] In his deposition, Loonsfoot indicated that, in June 2024, various current and former Locators contacted him about this lawsuit. (Doc. 50-4, pgs. 12-16). Loonsfoot said the Locators contacted him after learning about SCL's 1,000-hour bonus program, and that they discussed whether they should the litigation and their experiences at SCL. (*Id.*). It is unclear whether the Locators he spoke with also executed declarations in this case.

[17] The Court further notes, that unlike the declarations offered by Loonsfoot, the declarations referenced in *Wal-Mart* included *specific* accounts of the allegedly unlawful conduct.

*USA, LLC,* 705 F.3d 770, 774 (7th Cir.2013) (affirming decertification for class that included 2,341 class members, noting that plaintiffs could not overcome variance by offering testimony from 42 "representative" class members because "[c]lass counsel has not explained ... how these 'representatives' were chosen—if whether for example they were volunteers, or perhaps selected by class counsel after extensive interviews and hand picked to magnify the damages sought by the class").

Fifth, several of the declarations include inaccurate dates of employment or do not accurately reflect the declarant's varying positions while employed at SCL. Such errors suggest the declaration was not carefully reviewed and undermine evidentiary value.

There is an additional issue specific to Loonsfoot's declaration; numerous statements are inconsistent with his prior deposition testimony. For instance, Loonsfoot testified that the disputed meal break policy did not begin until March 2023 or perhaps as early as August 2022; prior to that, if he worked during a meal break, he was compensated; and prior to that, no one added a lunch break that he did not take. His declaration, however, indicates that he was not compensated for work performed during meal breaks and that managers added meal breaks to his time slip even when he did not take one throughout his employment from 2020-2023. Additionally, he testified that when he was a manager and trainer in 2022, he instructed his subordinates to take uninterrupted meal breaks, he did not direct anyone to work off the clock, and no one told him to require off-the-clock work.[18] His declaration, however, indicates that all

---

[18] *See* e.g. (Doc. 50-4, pg. 121):

Locators were subject to the unofficial meal break and off-the-clock policies from 2020-2023. Loonsfoot has not provided any reason for the discrepancies. At a minimum,[19] these discrepancies call into question the credibility of the inconsistent statements and undermine the "rigorous" analysis necessary for Rule 23 certification.

For these reasons, the declarations relied on by Loonsfoot do little to assist him in establishing commonality by a preponderance of the evidence.

Loonsfoot also points to his deposition testimony as providing a sufficient basis for establishing commonality. The Court disagrees. Loonsfoot's deposition testimony describes inconsistent and individualized experiences that undercut the existence of a company-wide, top-down policy requiring unpaid off-the-clock work either before or after shifts or during meal breaks. For example, Loonsfoot acknowledged that early in his employment, he was not required to clock out for meal breaks, that he typically worked

---

Q Okay. I'm going to put the out-of-town help 4 aside for a moment. For the people that were your regular employees that reported to you, what instructions did you give them about taking a 30-minute unpaid meal period?
A I -- the instructions I gave them were to clock out and take your lunch.
Q Did you ever tell anybody to work off the clock while they were on their lunch?
A No.
Q Did anybody ever -- anyone higher up than you ever tell you that you needed to have your utility locators work off the clock?
A No.
Q Do you know if your utility locators actually did clock out and take their lunch?
A I want -- I hope they did. I don't remember.
*See also* e.g., (Doc. 50-4, pg. 75):
Q So is it your understanding that while utility locators were going through the training process, they were allowed to take a lunch break?
A They were required to take a lunch break.
Q And during that time, were they, to your knowledge, fully relieved from duty, not doing any work, during that lunch break?
A Yes.

[19] Under the sham affidavit rule, "a deponent may not use an affidavit sworn to after a deposition to contradict deposition testimony without giving a credible explanation for the discrepancies." *Abraham v. Washington Grp. Intern., Inc.*, 766 F.3d 735, 741 (7th Cir. 2014). Here, the Court stops short of finding that the inconsistencies warrant striking under this rule.

through his shift without taking them, and that when he did take a break, it was uninterrupted. He also testified that he did not begin experiencing issues with management altering his meal break records until later in his tenure, at first stating that this practice began when he was a Lead Locator and then changing his account to say it began during his time as a Trainer (approximately August 2022). Moreover, as a Manager, Plaintiff testified that he never instructed subordinates to work off-the-clock or through lunch, and he did not observe his team doing so. These shifting accounts, combined with Loonsfoot's acknowledgement that enforcement varied by supervisor and workload, fail to demonstrate a uniform practice capable of class-wide resolution and instead suggest disparate, supervisor-driven conduct of the kind that is not suitable for class treatment.

Moreover, Loonsfoot's own account suggests that whether employees worked through breaks or off-the-clock often depended on situational factors, such as whether there were high-priority tickets or emergencies, whether an employee was particularly efficient or had a high "tickets per hour" rating, or how busy a given day was. For instance, he admitted that employees with higher productivity metrics routinely received overtime approval, and that on slower days, uninterrupted lunch breaks were typically allowed. These context-specific variations further undermine any suggestion of a consistent company-wide policy and instead reflect discretionary practices driven by workload, supervisor judgment, and individual performance. The need for such fact-specific determinations defeats commonality under Rule 23.

The declarations from proposed class members, when considered alongside Loonsfoot's testimony, further demonstrate a lack of uniformity and underscore the individualized nature of the alleged off-the-clock work and meal break practices. Loonsfoot testified the disputed meal break policy did not occur until August 2022 or March 2023, and that he was not subject to this policy earlier in his employment with SCL. But many of the declarants allege they were required to work during unpaid meal breaks prior to this time. Additionally, he expressly stated that, as a Manager and Trainer, he ensured his team members took uninterrupted breaks and did not instruct them to perform unpaid work. But several declarants indicate that they were subject to the meal break and off-the-clock policies when Loonsfoot was a Manager and Trainer. These inconsistencies suggest practices based on facts specific to each Locator. Thus, rather than supporting the existence of an unspoken company-wide policy, the evidence points to inconsistent and discretionary practices, which precludes a finding of commonality. *See Wal-Mart,* 564 U.S. at 353 ("Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.") (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L.Rev. 97, 132 (2009); *Phillips v. Sheriff of Cook Cty.,* 828 F.3d 541, 557-58 (7th Cir. 2016) ("Just as in *Wal-Mart,* [564 U.S. at 353, 131 S.Ct. 2541,] proof of a systemic practice which could tie all the claims together is 'absent here.' ").

Loonsfoot also cites testimony from senior management and the human resources director stating that all employees are treated equally, are subject to the same company-wide policies, and receive the same handbook. However, this evidence speaks only to

SCL's formal or written policies, which are not at issue in this case. These official policies are not relevant to Plaintiff's theory of liability which relies on the existence of unwritten or unspoken directives that allegedly required employees to work off-the-clock before and after shifts and during unpaid meal breaks. Thus, evidence that SCL maintained uniform written policies requiring compliance with wage and hour laws or that all employees received the same handbook does not establish commonality with respect to Loonsfoot's theory of the case.

Finally, Loonsfoot argues that certification is appropriate because similar allegations have been brought against SCL in other jurisdictions and, in some cases, courts have certified comparable claims. This argument is not persuasive. Certification is not a matter of presumption; it requires a "rigorous analysis" of the evidentiary record before the Court. *Wal-Mart*, 564 U.S. at 351. And for reasons already discussed, the evidentiary record in this case does not support a finding of commonality. *See also Monroe v. Stake Ctr. Locating*, LLC, No. 2:23-CV-692, 2025 WL 938103, at *6 (E.D. Va. Mar. 27, 2025) (denying class certification and rejecting contention that certification of similar actions in other district courts is sufficient under Rule 23) (quoting *Black Lives Matter L.A. v. City of Los Angeles*, 113 F.4th 1249, 1263 (9th Cir. 2024)).

In summary, the Court concludes that Loonsfoot has failed to submit proof showing that a companywide policy resulted in SCL failing to pay its Locators for all hours worked. The evidence Loonsfoot has submitted suggests that the alleged violations occurred at different times, under different circumstances, and were the result of the discretionary decisions of individual managers.

### 3. Typicality

Under Rule 23(a)(3), a class representative's claims or defenses must be "typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir.1983) (citations and internal quotation omitted).

Here, for the same reasons that Loonsfoot has failed to identify a common policy that is the cause of the alleged violations, he has failed to demonstrate that his claims are typical of the claims of other class members. If Loonsfoot cannot establish that he was injured by the same conduct that injured other class members, then his claims cannot be typical of the class. *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158, 102 S. Ct. 2364, 2371, 72 L. Ed. 2d 740 (1982) ("The commonality and typicality requirements of Rule 23(a) tend to merge.").

Additionally, Loonsfoot's deposition testimony suggests that his experience with the alleged off-the-clock policies differs materially from that of the class. For instance, Loonsfoot testified that he did not impose the alleged off-the-clock policies when he was a manager or a trainer, but putative class members allege they were subject to these policies during that same time, possibly under Loonsfoot's supervision. This undermines the notion of a uniform, company-wide policy and raises the possibility of unique defenses or credibility issues. As such, typicality is not satisfied. *See Orr v. Shicker*, 953 F.3d 490, 500 (7th Cir. 2020) ("Typicality requires 'enough congruence between the

named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group.'" ) (quoting *Spano v. Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011)); *Koos v. First National Bank,* 496 F.2d 1162, 1164 (7th Cir.1974) (where the representative party is subject to unique defenses his claim is not typical of the class).

### 4. Adequacy

To satisfy Rule 23(a)(4) the named plaintiff must "fairly and adequately represent the class." *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir. 1992). As to the class representative, this requirement is concerned with conflicts of interest between the class and its representatives. *Dukes,* 564 U.S. at 349 n.5, 131 S.Ct. 2541. This requirement is not met if the representative and the proposed class have antagonistic or conflicting interests. *See Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992). Here, Loonsfoot is not an adequate representative for the same reasons stated with respect to commonality and typicality.[20]

### 5. Predominance

Rule 23(b)(3) requires that (1) "the questions of law or fact to the members of the class predominate over any questions affecting only individual members"; and (2) "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). Commonality and predominance are closely linked requirements under Rule 23. But "the predominance criterion is far more

---

[20] Given the Court's findings, it need not address the adequacy of class counsel as to the off-the-clock claims.

demanding." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). Here, Loonsfoot has failed to establish a common question of law or fact that is capable of class-wide resolution. This "necessarily means that [he] ha[s] not satisfied … the more strenuous predominance requirement of Rule 23(b)(3)." *McCaster v. Darden Rests., Inc.*, 845 F.3d 794, 801 (7th Cir. 2017).

### B. Auto Allowance Policy

SCL concedes that the auto allowance policy claim is appropriate for class treatment. (Doc. 54, pg. 18 n.4) ("SCL acknowledges that its automobile reimbursement policy is a uniform policy applying to all Illinois Locators."). Additionally, SCL does not contest the adequacy of the named plaintiff[21] or of class counsel. For these reasons, and upon review of the record, the Court finds that Loonsfoot has satisfied Rule 23's class certification requirements with respect to the auto allowance claim.

As to the adequacy of class counsel, Loonsfoot seeks the appointment of six attorneys from three law firms as Class Counsel:

|   |   |   |
|---|---|---|
| 1. | Josephson Dunlap, LLP | Richard M. Schreiber<br>Michael A. Josephson<br>Andrew Dunlap |
| 2. | Bruckner Burch PLLC | Richard J. (Rex) Burch |
| 3. | Werman Salas P.C. | Maureen A. Salas<br>Douglas M. Werman |

---

[21] The issues that render Loonsfoot atypical and subject to unique defenses with respect to the off-the-clock claims do not present an issue as to the auto allowance claim.

There is no concern that Josephson Dunlap, LLP, and its specified attorneys and that Bruckner Burch PLLC, and its specified attorney, do not meet the requirements of Rule 23, as demonstrated by the declarations submitted by counsel.[22] (Doc. 50-32; Doc. 50-33). Plaintiff, however, does not provide any information as to Werman Salas P.C. and its specified attorneys, Maureen A. Salas and Douglas M. Werman. Accordingly, the Court does not have sufficient information to assess if this law firm and its attorneys are sufficiently qualified. *See* FED. R. CIV. P. 23(a)(4) and 23(g)(1). Accordingly, Werman Salas P.C. and its specified attorneys will not be appointed as class counsel at this time. Counsel may file supplemental briefing as to the appointment of this law firm and its attorneys if it so chooses.

## IV. DISPOSITION

For the forgoing reasons, the Court finds that Plaintiff Michael Loonsfoot has satisfied Rule 23's class certification requirements with respect to the auto allowance claim, but not with respect to his other claims. Therefore, the Motion for Class Certification (Doc. 50) is granted in part and denied in part. The Court **CERTIFIES** the following class in this case:

> All hourly Utility Locators who worked for SCL in Illinois who were subject to SCL's auto allowance policy, and/or per diem pay scheme at any time from September 21, 2020, to August 5, 2025.

---

[22] Under Rule 23(a)(4) class counsel must "fairly and adequately represent the class." *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir. 1992). This requires an inquiry into whether plaintiff's counsel is qualified, experienced, and generally able to conduct the proposed litigation. *See Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992). In conducting this analysis, the Court considers the four factors described in Rule 23(g): "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions ...; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class."

The Court **APPOINTS** Plaintiff Michael Loonsfoot as class representative. The Court **APPOINTS** the law firm of Josephson Dunlap, LLP and attorneys Richard M. Schreiber, Michael A. Josephson, and Andrew Dunlap, as well as the law firm of Bruckner Burch, PLLC and attorney Richard J. (Rex) Burch as class counsel.

A Status Conference will be scheduled, approximately 30 days from the date of this Memorandum & Order, to discuss matters such as: (1) the need to enter a scheduling and discovery order for additional merits discovery in advance of the filing of dispositive motions; (2) the class notice form; and (3) if necessary, other matters pertaining to the class.

**SO ORDERED.**

Dated: August 5, 2025

/s *David W. Dugan*

_____

DAVID W. DUGAN
United States District Judge

40